**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main St., Ste. 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
E-mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Kaili C. Lynn (State Bar No. 334933)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: klynn@bursor.com
          jwilner@bursor.com

**BURSOR & FISHER, P.A.**
Max S. Roberts (State Bar No. 363482)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10069
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-mail: mroberts@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEN ZHU, individually and on behalf of all others similarly situated, | **CLASS ACTION COMPLAINT** |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| EQUATIV INC., | |
| Defendant. | |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

# TABLE OF CONTENTS

**PAGE**

NATURE OF THE ACTION ..........................................................................................................1

THE PARTIES ...........................................................................................................................1

JURISDICTION AND VENUE ......................................................................................................2

FACTUAL ALLEGATIONS ..........................................................................................................2

I.    DATA BROKERS AND REAL-TIME BIDDING: THE INFORMATION ECONOMY ..........................................................................................................2

    A.    Data Brokers ...........................................................................................2

    B.    Real Time Bidding ..................................................................................8

    C.    Cookie Syncing ......................................................................................13

II.   AN OVERVIEW OF DEFENDANT'S SERVICES ............................................................17

    A.    Equativ and Sharethrough ......................................................................17

    B.    Defendant's Online Tracking Technology ...............................................20

        1.    Persistent Identifiers .................................................................25

            IP Addresses .............................................................................26

            Mobile Advertising Identifiers ...................................................30

            Other Identifiers ........................................................................35

        2.    Interception of Communications .................................................37

        3.    Identity Resolution ....................................................................38

        4.    Defendant Intentionally Hides Its Data Deletion Page................40

III.  DEFENDANT'S TRACKERS ARE PRESENT ON EACH OF THE SUBJECT WEBSITES AND ACROSS THE INTERNET ..............................................................41

    A.    Buzzfeed ..................................................................................................41

    B.    Zillow .....................................................................................................44

IV.   DEFENDANT'S SERVICES DEANONYMIZE USERS AND ENRICH DEFENDANT AND THE WEBSITE OPERATORS THROUGH REAL-TIME BIDDING AND PROFILING INDIVIDUALS................................................................46

    A.    Defendant Combines The Data From The Subject Websites With Other Data To Deanonymize Users.........................................................46

B.    The Partner Trackers Use The Profiles Created By Defendant To Enhance Their Advertising And Analytics Services ...............................................46

V.    PLAINTIFF'S EXPERIENCE ........................................................................................47

CLASS ALLEGATIONS........................................................................................................49

CAUSES OF ACTION...........................................................................................................51

COUNT I..........................................................................................................................51

COUNT II.........................................................................................................................53

COUNT III .......................................................................................................................56

COUNT IV .......................................................................................................................57

COUNT V .........................................................................................................................60

COUNT VI ........................................................................................................................61

PRAYER FOR RELIEF .........................................................................................................64

JURY TRIAL DEMANDED ...................................................................................................64

Plaintiff Ken Zhu ("Plaintiff") brings this action on behalf of himself, and all others similarly situated against Equativ Inc. ("Equativ" or "Defendant").  Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

## NATURE OF THE ACTION

1.     This class action lawsuit sets forth how Equativ surveils millions of Americans through their activity on the Internet and mobile applications. Equativ, through its software products and the software products of Sharethrough, a Supply-Side Platform (SSP) it acquired, tracks in real time and records indefinitely the personal information and specific web activity of hundreds of millions of Americans.

2.     This unlawfully collected information is worth billions of dollars to Defendant because it makes up the content of Defendant's identity graph and data products and creates individual sales of advertisements in the real-time-bidding ecosystem present on thousands of major websites where Defendant's services are installed.

3.     Plaintiff brings this action to enforce his constitutional rights to privacy and to seek damages under Federal and California law for the harm caused by the collection and sale of his confidential data and personal information.

## THE PARTIES

4.     Plaintiff Ken Zhu is a natural person and citizen of California, residing in San Francisco, California.  Plaintiff Zhu was in California when he accessed numerous websites where Defendant's tracking was present and had his activity on those websites and subsequent activity on other websites tracked by Defendant.

5.     Defendant Equativ Inc., is a Delaware corporation with its principal place of business at 498 Seventh Ave, New York, NY 10018.  Equativ acquired Sharethrough, Inc. in 2024 and has directed Sharethrough's activity and the operation of the Sharethrough Tracker since at least that time. Equativ also took possession of the information improperly acquired and compiled by Sharethrough prior to the acquisition and continues to maintain, use, and sell that information.

**JURISDICTION AND VENUE**

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from at least one Defendant.

7.     This Court has personal jurisdiction over Defendant because Defendant collected the private information of thousands or millions of people in California, sold that information to advertisers in California—who targeted advertisements to Californians based in part on their location in California—and profited from the sale of Californians' personal information.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this District and Plaintiff resides in this District.

**FACTUAL ALLEGATIONS**

**I.     DATA BROKERS AND REAL-TIME BIDDING: THE INFORMATION ECONOMY**

9.     To put the invasiveness of Defendant's privacy violations into perspective, it is important to understand three concepts: data brokers, real-time bidding, and cookie syncing.

10.     The import of these concepts is that: (i) Defendant is a data broker[1] that uniquely identifies and de-anonymizes users of various websites and mobile application by matching users' persistent identifier (*See infra*) values with comprehensive profiles held by Defendant; (ii) those profiles are offered up for sale through the real-time bidding process to the benefit of Defendant, the Partner Pixels, and Defendant's clients and to the detriment of users' privacy interests; and (iii) Defendant continues to build on those profiles by syncing with the Partner Pixels on websites and mobile applications and by sharing information about Class Members via server-to-serve (S2S) communications, and the value of its services enables Defendant to be brought onto a wide swath of websites and mobile applications, thus perpetuating the mass surveillance of users.

**A.     Data Brokers**

11.     While "[t]here is no single, agreed-upon definition of data brokers in United States

---

[1] *Data Broker Registration for Sharethrough*, Office of the Attorney General, https://oag.ca.gov/data-broker/registration/578001 (last accessed Jan. 19, 2026).

law,"[2] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions.  Cal. Civ. Code § 1798.99.80(c).

12.    Any entity that qualifies as a "data broker" under California law must specifically register as such.  Cal. Civ. Code § 1798.99.82(a)

13.    Some data brokers prefer to characterize themselves as "identity graph providers," but this is a distinction without a difference.  "An identity graph provides a single unified view of customers and prospects based on their interactions with a product or website across a set of devices and identifiers.  An identity graph is used for real-time personalization and advertising targeting for millions of users."[3]  This is exactly what data brokers do, and indeed, the entities that provide identity graphs are by and large required to register as data brokers under California law.  An "identity graph provider" is therefore just a euphemism for "data broker."

14.    "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[4]  Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data."  And whereas individual data sources "may provide only a few elements about a person's activities, data brokers combine these elements to form a detailed, composite view of the consumer's life."[5]

15.    For instance, as a report by NATO found, data brokers, like Defendant, collect two

---

[2] Justin Sherman, *Data Brokers and Sensitive Data on U.S. Individuals: Threats to American Civil Rights, National Security, and Democracy*, DUKE SANFORD CYBER POLICY PROGRAM, at 2 (2021), https://techpolicy.sanford.duke.edu/wp-content/uploads/sites/4/2021/08/Data-Brokers-and-Sensitive-Data-on-US-Individuals-Sherman-2021.pdf.

[3] IDENTITY GRAPHS ON AWS, https://aws.amazon.com/neptune/identity-graphs-on-aws/.

[4] *Id*.

[5] Tehila Minkus et al., *The City Privacy Attack: Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM CONFERENCE ON ONLINE SOCIAL NETWORKS, at 71, (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

---

sets of information: "observed and inferred (or modelled)."  The former "is data that has been collected and is actual," such as websites visited.[6]  Inferred data "is gleaned from observed data by modelling or profiling," meaning what consumers may be *expected* to do.[7]  On top of this, "[b]rokers typically collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[8]

16.    Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[9]  The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[10]

17.    This data collection has grave implications for Americans' right to privacy.  For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[11]

18.    As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights.  Even if data brokers do not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences"

---

[6] Henrik Twetman & Gundars Bergmanis-Korats, *Data Brokers and Security*, at 11, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.

[7] *Id*.

[8] *Id*.

[9] Sherman, *supra* note 6, at 1.

[10] *Id*.

[11] *Id*. at 9.

about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.

This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements. Many industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.

…

Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further driving up costs of goods and services (from insurance to housing) for minority groups.[12]

19.    Similarly, as the report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving consumers of the right to control who does and does not acquire their personal information, unwanted advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[13]

---

[12] *Id.*

[13] Twetman & Bergmanis-Korats, *supra* note 9, at 8.

20. In the modern age, these threats are far too real. For instance, the gunman who assassinated a Minnesota state representative and her husband "may have gotten their addresses or other personal details from online data broker services, according to court documents."[14]

21. Similarly, following the protests in Los Angeles in the summer of 2025:

[14] Lily Hay Newman, *Minnesota Shooting Suspect Allegedly Used Data Broker Sites to Find Targets' Addresses*, WIRED (June 16, 2025), https://www.wired.com/story/minnesota-lawmaker-shootings-people-search-data-brokers/.

> Tech-skeptical California lawmakers and activists fear the Trump administration will leverage tech tools to track and punish demonstrators accused of interfering with Immigration and Customs Enforcement raids. One possible instrument at ICE's disposal: location data, a highly detailed record of people's daily movements that's collected and sold by everything from weather apps to data brokers.[15]

22.    Of course, data brokers do not just track people for no reason; they do so because they have their trackers installed on users' browsers and are paid by website and mobile app operators (or the Partner Pixel operators) to do so.  In return, data brokers' services become more valuable because data brokers can track users on a wider variety of platforms.

23.    Data brokers, like Defendant, are able to compile such wide swaths of information in part by collecting users' IP addresses and other device information, which is used by data brokers like Defendant to track users across the Internet.[16]  Indeed, as McAfee (a data security company) notes, "data brokers … can even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[17]

24.    These data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you.  They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single."  Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[18]

25.    This is a concept courts have faced before.  For instance, as a court recently noted regarding an "identity resolution product," such a product:

---

[15] Tyler Katzenberger, *LA Protests Fuel California Drive To Hide Data From Trump*, Politico (June 11, 2025), https://www.politico.com/news/2025/06/11/la-protests-california-hide-data-trump-00400127

[16] *Id*. at 11.

[17] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, McAfee, (Jan. 28, 2025), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

[18] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, Fathom Analytics, (May 10, 2022), https://usefathom.com/blog/data-brokers.

identifies consumers, addresses, or households across multiple media by linking together separate datasets relating to individual customers. For example, the product might correlate an email address submitted online with publicly available property information associated with the same email address. This type of product enables clients to execute targeted marketing campaigns across different types of media.

*Adstra, LLC v. Kinesso, LLC*, 2025 WL 552050, at *2 (S.D.N.Y. Feb. 19, 2025); *see also* Marc Chase McAllister, *Modernizing the Video Privacy Protection Act*, 25 Geo. Mason L. Rev. 102, 135 (2017) ("Connecting individuals to devices can, in fact, be accomplished quite easily.").

26. In short, data brokers like Defendant track consumers across the Internet and mobile applications, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder. The "highest bidder" is a literal term, as explained below.

### B. Real Time Bidding

27. Defendant and its clients and partners "sell" or otherwise monetize comprehensive user profiles, through real-time bidding.

28. "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[19]

29. "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)." An SSP "work[s] with website or app publishers to help them participate in the RTB process." "DSPs primarily work with advertisers to help them evaluate the value of user impressions and optimize the bid prices they put forth."[20] And an Advertising Exchange "allows advertisers and publishers to use the same

---

[19] Sara Geoghegan, *What is Real Time Bidding?,* ELECTRONIC PRIVACY INFORMATION CENTER, (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

[20] Geoghegan, *supra*.

technological platform, services, and methods, and 'speak the same language' in order to exchange data, set prices, and ultimately serve an ad."[21]

30.    In other words, SSPs (like Defendant) provide user information to advertisers that might be interested in those users, DSPs help advertisers select which users to advertise and target, and an Advertising Exchange is the platform on which all of this happens.  Defendant plays crucial roles in this process as a data broker, an SSP, and an Advertising Exchange.

31.    The RTB process works as follows:

> After a user loads a website or app, an SSP will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more.  After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.

> Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost.  But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process.  This information can be added to existing dossiers DSPs have on a user.[22]



---

[21] *Introducing To Ad Serving*, MICROSOFT IGNITE (Mar. 3, 2024), https://learn.microsoft.com/en-us/xandr/industry-reference/introduction-to-ad-serving.

[22] Geoghegan, *supra*; *see also Real-Time Bidding*, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.

32.     Facilitating this real-time bidding process means SSPs and DSPs must have as much information as possible about consumers to procure the greatest interest from advertisers and obtain the highest bids for websites and app operators' users.  But these SSPs and DSPs receive assistance by connecting with Data Management Platforms ("DMPs") or data brokers like Defendant:

> the economic incentives of an auction mean that DSP with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities.  As a consequence, the bid request is not the end of the road.  The DSP enlists a final actor, the data management platform (DMP) [or data broker].  DSPs send bid requests to DMPs [or data brokers], who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers.  The DSP also wins the right to cookie sync its own cookies with those from the [Advertising Exchange], thus enabling easier linkage of the data to the user's profile in the future.[23]



33.     In other words, before bidding to show a user an advertisement, SSPs and DSPs will attempt to determine what other information about a user may be available, which they achieve by connecting with Defendant, who then matches a consumer's information from a particular website or mobile application (*e.g.*, their IP address, email address, or device information) with any profiles in it has compiled.

---

[23] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022) https://tinyurl.com/yjddt5ey.

34. If there is a match, then advertisers will pay more money to show users an advertisement because they have more information to help achieve their targeted marketing aims. This naturally enriches website and app operators, because their users are more valuable within this scheme. It also enriches SSPs ( like Defendant) who can offer users to advertisers for more money based on the greater number of traits available, and DSPs who can receive higher bids for the same users. And SSPs and DSPs can continue linking users on a website or mobile application through the Advertising Exchange, which enhances the SSP's and DSP's ability to better identify users in the future and helps the SSP and DSP profit further as well.

35. Last, Defendant benefits because (i) Defendant will gain information from the SSPs, DSPs, and other ad-tech players it syncs with that it can add to its already comprehensive profiles, and (ii) that will make Defendant's services more valuable.

36. As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

(a) "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, website and app operators] to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."

(b) "send[ing] sensitive data across geographic borders."

(c) sending consumer data "***to potentially dozens of bidders simultaneously***, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad. Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[24]

37. The last point bears additional emphasis, because it means that the profiles that Defendant compiles are broadcast to *all prospective advertisers*, even if advertisers do not ultimately show a user an advertisement. Further, it leaves users more exposed if bad actors infiltrate and

___

[24] Office of Technology & Division of Privacy and Identity Protection, *Unpacking Real Time Bidding through FTC's case on Mobilewalla*, FEDERAL TRADE COMMISSION, (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.

exploit the RTB ecosystem and obtain the sensitive data that Defendant provides to DSPs. This greatly diminishes the ability of users to control their personal information, and it serves as a national security risk because foreign adversaries can obtain and exploit the information to their advantage.

38.     Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[25]

39.     For these reasons, some have characterized "real-time bidding" as "[t]he biggest data breach ever recorded" because of the sheer number of entities that receive personal information[26]:



40.     All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm long recognized at common law and one statutes like the CIPA were enacted to protect against. *Ribas v. Clark*, 38 Cal. 3d 355, 361 (1985) (noting the CIPA was drafted with a two-party consent requirement to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements"); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763-64 (1989) ("[B]oth the common law and the literal

---

[25] Geoghegan, *supra*.

[26] Dr. Johnny Ryan, "RTB" Adtech & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).

understandings of privacy encompass the individual's control of information concerning his or her person."); *Selby v. Sovrn Holdings, Inc.*, 2025 WL 2950164, at *3 (N.D. Cal. Oct. 17, 2025) (finding a "highly offensive privacy intrusion" and "injury for the purposes of CIPA" where "Plaintiffs have alleged that Sovrn engages in unauthorized widespread tracking and data collection, allowing it to compile detailed profiles of each Plaintiff's online web browsing activity—including highly sensitive browsing activity—tied to their email address and other personal identifiers") (cleaned up); *Deivaprakash v. Condé Nast Digital*, --- F. Supp. 3d ---, 2025 WL 2541952, at *4 (N.D. Cal. Sept. 4, 2025) (finding standing for the purpose of CIPA and "likely [] Article III" where the collection of IP addresses and other identifiers "allowed the third parties to: (1) build a profile reflecting [plaintiff's] personal information; and (2) interfere with [plaintiff's] ability to remain anonymous"); *Gilligan v. Experian Data Corp.*, 2026 WL 32259, at *2 (N.D. Cal. Jan. 6, 2026) ("Experian engages in unauthorized widespread tracking and data collection, allowing it to compile detailed profiles of each Plaintiff's online web browsing activity tied to their email address and other personal identifiers, and that Experian continues to track "future web browsing activity across the internet."… such allegations satisfy the requirement for a "highly offensive" intrusion that invades reasonable internet users' expectations of privacy.") (cleaned up).

### C.    Cookie Syncing

41.    The RTB ecosystem underscores *why* Defendant profits from compiling highly detailed user profiles and its incentive for gathering as much identifiable data as possible.  In turn, "cookie syncing" explains *how* Defendant shares and gathers information to offer the most complete user profiles up for sale.

42.    Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies, and match the different IDs they assign for the same user while they browse the web."[27]

---

[27] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

---

This allows entities like the Third Parties to circumvent "the restriction that sites can't read each other['s] cookies, in order to better facilitate targeting and real-time bidding."[28]

43.    Cookie syncing works as follows:

Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rd-parties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future. Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.

Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com. Thus, advertiser.com does not (and cannot) know which users visit website3.com. However, *as soon as the code of tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3).*

…

When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. *To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user.* Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) *synchronize (i.e., join) two different identities (cookies) of the same user on the web.*[29]

//

//

//

//

//

---

[28] Gunes Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014).

[29] Papadopoulos, *supra*, at 1433.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    14



44.     Through this process, third party trackers like Defendant's are not only able to resolve user identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2 knew as "user123" are the same person), they can "track a user to a much larger number of websites," even though that "do not have any collaboration with" the third party.[30]

45.     On the flip side, "CSync may re-identify web users even after they delete their cookies."[31]  "[W]hen a user erases her browser state and restarts browsing, trackers usually place and sync a new set of userIDs, and eventually reconstruct a new browsing history."[32]  But if a tracker can "respawn" its cookie or like to another persistent identifier (like an IP address), "then through CSync, all of them can link the user's browsing histories from before and after her state erasure. Consequently: (i) users are not able to abolish their assigned userIDs even after carefully erasing

---

[30] Papadopoulos, *supra*, at 1434.

[31] *Id.*

[32] *See id.*

their set cookies, and (ii) trackers are enabled to link user's history across state resets."[33]

46.     Thus, "syncing userIDs of a given user increases the user identifiability while browsing, thus reducing their overall anonymity on the Web."[34]

47.     Cookie syncing is precisely what is happening here.  When Defendant's cookies are installed on users' browsers, they are syncing their unique user identifiers with other third parties on the websites (*e.g.*, the Partner Trackers).[35]  The result of this process is not only that a single user is identified as one person by these multiple third parties, but they share all the information about that user with one another (because the cookie is linked to a specific user profile).  This prevents users from being anonymous when they visit websites.

*          *          *

48.     To summarize the proceeding allegations, Defendant is a data broker that focuses on collecting as much information about users as possible to create comprehensive user profiles.  Through "cookie syncing," those profiles are shared by Defendant with other entities (and vice versa) to compile as many details and attributes as possible.  The profiles are offered up for sale to advertisers via real-time bidding, where they become increasingly more valuable as advertisers know more about the user.  Thus, Defendant increases the price premium that advertisers are willing to pay because Defendant's ability to match users up to comprehensive profiles allows users to be identified and more directly targeted based on an assortment of identifiers and interests.

49.     Accordingly, Defendant is using its Trackers in conjunction with website and mobile application operators and other third parties (*e.g.*, the Partner Pixels) to (i) de-anonymize users, (ii) offer users up for sale in real-time bidding, and (iii) allow website operators to maximum revenue by installing Defendant's Trackers and allowing the Defendant to collect as much information about users as possible without consent.[36]

---

[33] *Id.*

[34] *Id.* at 1441.

[35] The "Partner Trackers" shall refer to any of the third party trackers with whom OpenX syncs its Trackers on any particular website, including but not limited to Microsoft's Adnxs tracker and Google's DoubleClick tracker (alleged below).

[36] Any purported "consent" obtained by third-party websites via cookie banners is invalid because those: (i) those often fail to honor the user's selected preference; (ii) fail to disclose data is being

---

50.     Of course, Defendant also benefits from this arrangement because websites and apps will want to employ Defendant's services to bring in more advertising revenue, meaning Defendant can continue to expand and grow the information they have about any consumers and add to consumers' profiles, which further perpetuates the value of Defendant's services.

51.     As it stands though, Defendant is already one of the largest players in this industry. Defendant achieved this status using a variety of technologies and services, as described below.

## II.     AN OVERVIEW OF DEFENDANT'S SERVICES

### A.     Equativ and Sharethrough

52.     Equativ describes itself as "a global, end-to-end media platform" that specializes in multiple forms of advertising technology, including streaming ads and real-time bidding.[37]

53.     Sharethrough—who is a registered data broker in California[38] is "one of the leading independent omnichannel ad exchanges in the world" and is "committed to preserving an open internet with independent and accessible content funded by quality advertising."[39]

54.     Equativ acquired Sharethrough in June 2024 and, by doing so, took control of Sharethrough's tracking technology and integrated Sharethrough's data into its own products.[40]

55.     In June 2025, Equativ announced the "full unification of Sharethrough into its global brand and operations, forming one of the largest global independent media platforms and marketplaces."[41]

56.     Sharethrough claims it processes 275+ terabytes of data daily, facilitates 160 billion

---

sent to a credit reporting agency for identity resolution; and (iii) TransUnion is a third party to that interaction, engaging in the recording or decoding of data it has no direct right to access.

[37] https://www.equativ.com/press/equativ-launches-media-planning-agent-to-enhance-buyer-efficiency-and-boost-campaign-outcomes.

[38] *Data Broker Registration for Sharethrough Inc.*, Office of the Attorney General, https://oag.ca.gov/data-broker/registration/578001 (last accessed Feb. 2026).

[39] *Sharethrough USA*, CRUNCHBASE, https://www.crunchbase.com/organization/sharethrough (last accessed Feb. 2026)

[40] *Equativ and Sharethrough Will Now Operate Under Equativ Brand, Solidifying Global Position as Leading End-to-End Media Platform*, Equativ, https://www.equativ.com/press/equativ-and-sharethrough-will-now-operate-under-equativ-brand-solidifying-global-position-as-leading-end-to-end-media-platform (June 9, 2025).

[41] *Id.*

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    17

advertiser bids, generates 120 billion daily ad impressions, and has 925 publisher partners.[42]

57.     Like Equativ, Sharethrough "is a supply-side platform ("SSP") and advertising exchange" with "technology" that "enables… online auctions for advertising space on Partner Sites."[43]

58.     Through its "Advertising Platform, Sharethrough connects Partner Sites to buyers of advertising space that wish to bid on Partner ad space inventory. Buyers include advertisers and intermediary demand-side partners… Buyers work with Sharethrough based on contractual relationships to deliver ads based on your personal interests and to reach their target audiences."[44]

59.     Defendant processes consumers' "Personal Data when [they] visit third-party websites, mobile applications and over-the-top ("OTT") devices (such as SmartTVs or applications on your Smart TV)  ("Partner Sites"), that use our advertising platform (the "Advertising Platform") to serve targeted advertisements to you based on your personal interests ("Advertisements")."[45]

60.     Defendant "operate[s] on an open-source protocol to provide our services, known as Open RTB. This open-source protocol allows the collection of information such as: [c]ookie identifiers," including "Sharethrough Cookies," which are small files "placed on the browser" of users' computers. "These cookies are used to display promotions or advertisements on Partner Sites based on your interests. They collect information about your activities on our Partner Sites and other sites to provide you with Advertisements that match your interests."[46]

61.     Defendant also collects and stores "cookie identifiers from a variety of domains, and store such identifiers at either our domain or our partners' domains. We also engage in cookie syncing, which is the matching of our cookie identifiers with those of our clients and other partners."

62.     Cookie syncing facilitates targeted advertising. It "ensures that SSPs, DMPs, DSPs,

---

[42] *A Mission to Help the Independent Web Grow & Thrive*, SHARETHROUGH, https://www.sharethrough.com/company (last accessed Feb. 2026).

[43] *User Rights Policy Notice*, SHARETHROUGH, https://privacy-center.sharethrough.com/en/consumer-privacy-notice/ (last accessed Feb. 2026).

[44] *Id.*

[45] *Id.*

[46] *Id.*

and all ad tech partners can match up the users they have in their separate databases so that custom-tailored ads specific to each user can be delivered."[47]

63.    Both Equativ and Sharethrough's Ad Exchanges support a variety of "targeting" criteria used by publishers and advertisers to identify ad space where buyers want ads to be served.

64.    "Targeting" involves the collection of data about consumers, their identities, and their devices, including mobile phones. Defendant's business relies on collecting data that its partners want to use to learn about consumers and maximize the buyers' advertising dollars.

65.    In other words, Defendant compiles comprehensive user profiles by tracking users across the Internet.  Defendant then augments the information of its client's end users with the profile data to make that information more valuable to advertisers by aggregating that information into profiles of consumers, thereby driving advertisers' revenue.

66.    Defendant uses these individual profiles to provide marketers with curated packages that identify and target specific customers.[48]  Indeed, Defendant notes it has curated packages "based on data, demographics and site content to reach advertiser audiences at scale."[49]

67.    Defendant claims that it uses "1st or 3rd Party Data: Built into Sharethrough Deals via Liveramp" and has the capability for "Interest Targeting: Comscore behavioral and contextual data based on the user's interest/digital consumption patterns."[50]

68.    Put differently, Sharethrough's curated packages allow its clients/partners to better target advertising to consumers. It does this by facilitating the synthesis of 1st and 3rd party data on consumers into profiles/dossiers of their interests. Knowing and leveraging consumers' interests help advertisers sell more products, because ads are then placed to reach people more likely to buy the products being advertised.

---

[47] Trey Titone, *Cookie Syncing Explained*, AD TECH EXPLAINED https://www.adtechexplained.com/p/cookie-syncing-explained/ (Sep. 30, 2019).

[48] *Inventory Curation*, SHARETHROUGH, https://www.sharethrough.com/advertisers/curation/inventory-curation (last accessed Feb. 2026)

[49] *Maximize Performance & Scale With Curated Packages Powered By Machine Learning,* SHARETHROUGH, https://www.sharethrough.com/advertisers/curation (last accessed Feb. 2026)

[50] *Id.*

69.     By way of example, Defendant sells a "Black Friday & Cyber Monday Seasonal Package" that targets "Online Holiday Shoppers, In-Store Holiday Shoppers [and] Last Minute Holiday Gift Shoppers."[51]

70.     In other words, Defendant has curated advertising "packages" that are meant to target a specific type of consumer, such as those who are purchasing a gift for Mother's Day, those who have an interest in baseball, or those who celebrate LGBTQ+ pride. These "packages" require information about consumers' demographics (gender, sexuality) or interests (baseball, outdoor grilling) in order to be correctly "curated" or targeted to specific consumers.

71.     Despite having access to hundreds of millions of Americans' identities,[52] Defendant is a bad actor and has violated thousands of individuals' privacy rights.

## B.     Defendant's Online Tracking Technology

72.     As noted above, Defendant controls Sharethrough's online tracking technology (the "Sharethrough Trackers" and "Sharethrough Cookies") as well as other online tracking technologies that share information with other data brokers and identity graph providers (the "Equativ Trackers").

73.     The Sharethrough and Equativ Trackers are part of a massive web of online tracking technologies that, in turn, provide ongoing information to Defendant.

74.     It is estimated that the Sharethrough Trackers collected information on 0.31% of all web traffic, hundreds of billions of interactions with websites.[53]  As Sharethrough has admitted, it "processes 275+ terabytes of data daily, facilitates 160 billion advertiser bids, generates 120 billion daily ad impressions."[54] To put the volume of a terabyte into perspective, "10 Terabytes could hold the entire printed collection of the U.S. Library of Congress."[55]

---

[51] *Black Friday & Cyber Monday Seasonal Package*, SHARETHROUGH, https://www.sharethrough.com/advertisers/curation/inventory-curation/black-friday-cyber-monday

[52] *Brinztech Alert: Data of Sharethrough are on Sale*, BRINZTECH, https://www.brinztech.com/breach-alerts/brinztech-alert-data-of-sharethrough-are-on-sale/ (Jul. 9, 2025).

[53] https://www.ghostery.com/whotracksme/trackers/sharethrough (last visited Feb. 23, 2026).

[54] *A Mission to Help the Independent Web Grow & Thrive*, SHARETHROUGH, https://www.sharethrough.com/company (last accessed Feb. 2026).

[55] *What is a Terabyte?* TERADATA, https://www.teradata.com/glossary/what-is-a-terabyte

75.    Moreover, Defendant's ad exchange reaches millions of Americans, up to "196 million total US uniques," roughly 59% of the US population, in 2022. Globally, Sharethrough's ad exchange reached "296 million global uniques" in 2022.[56]

76.    The Sharethrough Tracker collects highly detailed, invasive data, including but not limited to data that it collects through DMPs and DSPs.  DMPs and DSPs, through cookie syncing, identity resolutions, and other data sharing , help Defendant collect behavior and profile data.

77.    According to Sharethrough, there has been a recent upswing towards the "[e]volvement and implementation of data privacy laws to protect users and create privacy forward environments."[57]

78.    Nevertheless, Defendant advertises its ability to "provide[] a unified access point to cookieless inventory and solutions to help find your unaddressable audience."[58]

79.    Defendant admits that its capabilities "enabl[e] more precise targeting of un-addressable audiences while prioritizing focused solutions. Our expertise in omnichannel scale, site directness, and ad experience ensures optimal value for advertisers in a less trackable environment."[59]

80.    Put differently, Sharethrough is claiming that despite the creation of stronger privacy regulations, it is still able to target an otherwise "un-addressable" (i.e., hidden, or protected) audience through its targeting capabilities.

81.    Sharethrough's targeting capabilities are a result of the massive amount of information it collects.

82.    Defendant, through its Sharethrough cookies, collects "information about your activities on our Partner Sites and other sites to provide you with Advertisements that match your

[56] *Overview of STX*, SHARETHROUGH, https://support.sharethrough.com/hc/en-us/articles/207464003-Overview-of-STX.

[57] *Implement our Cookieless Advertising Solutions for Enhanced Campaign Performance*, SHARETHROUGH, https://www.sharethrough.com/advertisers/cookieless-advertising#approach (last accessed Feb. 2026).

[58] *Implement our Cookieless Advertising Solutions for Enhanced Campaign Performance*, SHARETHROUGH, https://www.sharethrough.com/advertisers/cookieless-advertising#approach (last accessed Feb. 2026).

[59] *Id*.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    21

interests. We may collect and store cookie identifiers from a variety of domains, and store such identifiers at either our domain or our partners' domains. <u>We also engage in cookie syncing</u>, which is the matching of our cookie identifiers with those of our clients and other partners."[60]

83.    Defendant, through the Trackers, can also "count[] users who interacted with certain Advertisements and understand[] the scope of that interaction."[61]

84.    Defendant also collects "[c]lickstream data," which "includes the Advertisements you have clicked or that have otherwise been viewable to you, the amount of Advertisements displayed and the amount of time the Advertisement was viewable to you."[62]

85.    Defendant also collects "[d]evice information," such as "device type (e.g., laptop, mobile, TV), model, manufacturer, operating system, time zone, telephone carrier information, network information (e.g., WIFI), and mobile application information. Mobile device information includes standard mobile advertising identifiers located on every mobile device. These are: **IDFA** – advertising identifier used on Apple's iOS devices; and **Google Advertising ID** (**AAID** or **GAID**) – advertising identifier used on Android devices, to track your use of mobile apps on your device(s)."[63]

86.    Defendant also collects "[g]eolocation data," which is "[l]ocation information such as city, country, zip code/postal code, and/or longitude/latitude." Sharethrough also collects "[d]ate and time of your visit to a Partner Site," "IP address," and the "[u]ser agent – [a] short bit of text that attempts to describe the software/browser (the "**Agent**") that is making the request to a website. The user agent often includes descriptions of the operating system and device type that the Agent is running on."

87.    Defendant also collects "[i]nformation about your internet connection and, and other communication data and the resources that may be a result of your access to Advertisements on

---

[60] *User Rights Policy Notice*, SHARETHROUGH, https://privacy-center.sharethrough.com/en/consumer-privacy-notice/ (Aug. 2, 2024) (emphasis added).

[61] *Id.*

[62] *Id.*

[63] *Id.*

Partner Sites."[64]

88.    Defendant has a symbiotic relationship with publishers and advertisers (its "Advertising Partners") that collect behavior and profile data at the more granular level.

89.    Defendant collects and compiles vast amounts of Internet users' activity on a wide variety of websites through its own tracking methods, and also through its Advertising Partners.

90.    The Advertising Partners that Defendant contracts with have their own tag and trackers and profiles, which are integrated into the design of websites.  To facilitate the identity resolution process, described below, Advertising Partners and their associated tracking solutions send data to Defendant to "map" that information.

91.    For example, LiveRamp, a data broker, is one Sharethrough Advertising Partner that Defendant interacts with to collect and analyze sensitive information.

92.    Defendant's "partnership with LiveRamp and support of the RampID" allows advertisers to "scale match-rates of their onboarded first-party data & customer profiles via programmatic campaign activations across our brand safe omni-channel media partnerships."

93.    The LiveRamp and Sharethrough partnership allows advertisers to "[m]easure and optimize performance against your matched fi[r]st-party people-based signals through open exchange targeting in your RampID supporting DSP, or directly share your onboarded data profiles with Sharethrough's 'destination' tile in LiveRamp's Connect UI for targeting and activation via Sharethrough PMP/Deals."[65]

94.    This means that Defendant, when partnered with LiveRamp, is able to facilitate the aggregation and matching of "first-party data" (meaning Data Liveramp collects via its own trackers and partnerships with other data brokers)[66] with information Defendant has collected on an individual.

95.    Essentially, Defendant allows advertisers to upload even more data on their

[64] *Id.*

[65] *Sharethrough*, LIVERAMP, https://partner-directory.liveramp.com/partners/sharethrough (last accessed Feb. 2026).

[66] *What is first-party data and how does it benefit your marketing strategy*, Piwik Pro, https://piwik.pro/blog/first-party-data-value/

customers, including data about customers' behavior and actions taken on advertisers' website, and then combine it with both LiveRamp's and Defendant's own data to better target advertising to those advertisers' customers.

96.     Defendant also touts its "Audience Based Targeting via Sharethrough Audience Solutions."[67]

97.     Defendant goes on to say that it discloses the personal data it collects.

98.     Defendant discloses consumers' personal information to "[b]uyers for real time transactions for the sale of Advertisements using the Open Real Time Bidding protocol."[68]

99.     Defendant also discloses consumers' personal information to "other Buyers, through the synchronization of our cookie identifiers with the identifiers of other third parties; these partners are intermediaries that source advertisements related to your personal interest."[69]

100.     Defendant also discloses consumers' personal information to "our identity partners (independent companies that qualify you into broad interest-based categories in order to serve you Advertisements based on your personal interests such as LiveRamp or Unified ID 2.0)."

101.     In this way, Defendant participates in, and benefits from, the aggregation of consumers' personal data – including their interests and demographics, which allow them to be sorted into "audience segments."

102.     As Defendant describes it: "Audience segmentation is the process of grouping people based on shared characteristics. These groups, or audience segments, can be used to create more targeted campaigns, and tailored messaging that resonate with your target audiences."[70]

103.     The Advertising Partners that Plaintiff is currently aware of that engage in this practice include but are not limited to LiveRamp, Tealium,[71] Moat (acquired by Oracle), and The

[67] *Implement our Cookieless Advertising Solutions for Enhanced Campaign Performance*, SHARETHROUGH, https://www.sharethrough.com/advertisers/cookieless-advertising#approach (last accessed Feb. 2026).

[68] *User Rights Policy Notice*, SHARETHROUGH, https://privacy-center.sharethrough.com/en/consumer-privacy-notice/ (Aug. 2, 2024).

[69] *Id.*

[70] *Audience segmentation: How to perfect it for your marketing*, GWI (last accessed Feb. 2026), https://www.gwi.com/blog/audience-segmentation

[71] *Sharethrough*, TEALIUM, https://tealium.com/integrations/sharethrough/

Trade Desk.[72]  However, there are many more Advertising Partners.[73]

### 1. Persistent Identifiers

104.    The collection of persistent identifiers and URL information play particular roles in the Equativ surveillance apparatus.

105.    One way that Defendant tracks individuals across multiple websites is through the use of persistent identifiers.  As the name suggests, persistent identifiers identify information that follows an Internet user from one website or app to another. Defendant uses these identifiers to confirm that using a particular website is the same person identified by Sharethrough on another website.

106.    One form of persistent identifier is a browser "cookie."  "Cookies are bits of data that are sent to and from your browser to identify you.  When you open a website, your browser sends a piece of data to the web server hosting that website."[74]

107.    Defendant uses several cookies, including but not limited to the 'stx_user_id' cookie.[75]

108.    Defendant also discusses how it offers "DSP-initiated User ID Syncing." For this functionality, "Sharethrough hosts a match table so you can request previously sync'd IDs at bid request time."[76] Sharethrough advises its Advertising Partners that "[i]n order to sync a user, call the following as a pixel, or as the endpoint directly[:]    <img src="https://match.sharethrough.com/sync/v1?source_id=[DSP Source ID]&source_user_id=[DSP User ID]" width="1" height="1">." Sharethrough then specifies that an Advertising Partner need only "[r]eplace the following parameters: DSP Source ID should be replaced with your given seat

---

[72] *Native Advertising Exchange Sharethrough Joins The Trade Desk's Unified ID Solution*, THETRADEDESK INVESTOR RELATIONS, https://investors.thetradedesk.com/news-and-events/news/news-details/2019/Native-Advertising-Exchange-Sharethrough-Joins-The-Trade-Desks-Unified-ID-Solution-01-20-2019/default.aspx (Jan. 22, 2019).

[73] *See Optimizing Ads for Attention & Performance*, SHARETHROUGH, https://www.sharethrough.com/advertisers

[74] https://www.microsoft.com/en-us/edge/learning-center/what-are-cookies?form=MA13I2 (last visited Dec. 23, 2024).

[75] *Host Search Results: match.sharethrough.com*, COOKIEPEDIA, https://cookiepedia.co.uk/host/match.sharethrough.com (last accessed Feb. 2026).

[76] *User ID Syncing,* SHARETHROUGH, https://support.sharethrough.com/hc/en-us/articles/206239846-User-ID-Syncing

key / source ID" and "DSP U[s]er ID should be replaced by the User ID you'd like us to return at bid request time."

109.    In plain language, Defendant is advising website operators to deploy the abovementioned code on their websites to better match their customers to trackable user IDs that, once parsed, can be used to de-anonymize users or better segment them for targeted advertising.

110.    After the cookie is loaded onto a person's browser, each time that person visits a website where the Sharethrough Tracker is operating, Defendant uses the cookie to identify the website visitor as the same person who visited previous websites with the same cookie installed on their browser.  As such, Defendant is able to track each individual internet user across multiple sites to create a more detailed profile on that person's beliefs, interests, and habits.

111.    This information is cross-referenced with other information collected by Defendant to specifically identify the individual using the device and to add this web-activity information to a larger profile on the individual to sell their profile for targeted advertising.

**IP Addresses**

112.    IP addresses are another common persistent identifier.

113.    Defendant collects the IP addresses of consumers who use the websites and applications where its Trackers are present.[77]

114.    An IP address is a unique set of numbers assigned to a device on a network, which is typically expressed as four sets of numbers separated by periods (*e.g.*, 192.168.123.132).  The traditional format of IP addresses is called IPv4, and it has a finite amount of combinations and thus is limited to approximately 4.3 billion addresses.  Because this proved to be insufficient as the Internet grew, IPv6 was introduced.  IPv6 offers a vastly larger address space with 340 undecillion possible addresses.  While IPv6 adoption has been increasing, many networks still rely on IPv4.[78]

115.    Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another.  An IP address is essential for

---

[77] *User Rights Policy Notice*, SHARETHROUGH, https://privacy-center.sharethrough.com/en/consumer-privacy-notice/ (Aug. 2, 2024).

[78] *See, e.g.*, https://www.cloudflare.com/learning/network-layer/internet-protocol/ (last visited Dec. 23, 2024); https://netbeez.net/blog/rfc1918/ (last visited Dec. 23, 2024).

identifying a device on the internet or within a local network, facilitating smooth communication between devices.

116. IP addresses are not freely accessible. If an individual is not actively sending data packets out, his or her IP address remains private and is not broadcast to the wider internet.

117. IP addresses can be used to determine the approximate physical location of a device. For example, services like iplocation.io use databases that map IP addresses to geographic areas—often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider associated with the public IP.[79] Thus, knowing a user's public IP address—and therefore geographical location—"provide[s] a level of specificity previously unfound in marketing."[80]

118. An IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[81] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[82] Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[83] because "[c]ompanies can use an IP address … to personally identify individuals."[84]

119. In fact, an IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly-targeted audience. Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or

---

[79] https://iplocation.io/ (last visited Dec. 23, 2024).

[80] *IP Targeting: Understanding This Essential Marketing Tool*, AccuData (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[81] *Location-Based Targeting That Puts You in Control*, Choozle, https://choozle.com/geotargeting-strategies/.

[82] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LinkedIn (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert williams-z7bhf.

[83] *IP Targeting: Understanding This Essential Marketing Tool*, AccuData (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[84] Trey Titone, *The Future Of IP Address As An Advertising Identifier*, Ad Tech Explained (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

services will appeal to their needs."[85] For example, for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event.[86]

120. "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address. IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads to specific households or businesses based on their location."[87]

121. "IP targeting capabilities are highly precise, with an accuracy rate of over 95%. This means that advertisers can deliver highly targeted ads to specific households or businesses, rather than relying on more general demographics or behavioral data."[88]

122. In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's IP address because it "can be more cost-effective than other forms of advertising."[89] "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[90]

123. In addition, "IP address targeting can help businesses to improve their overall marketing strategy."[91] "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[92]

124. Putting IP addresses in the hands of a data broker like Sharethrough is particularly invasive, as the NATO report noted:

---

[85] *See*, *e.g.*, *The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.

[86] *See*, *e.g.*, *Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns.

[87] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj 0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV 5-5maUaAgtNEALw_wcB.

[88] *Id*.

[89] Williams, https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf.

[90] *Id*.

[91] *Id*.

[92] *Id*.

---

125.   [a] data broker may receive information about a[] [website] user, including his … IP address.  The user then opens the [website] while his phone is connected to his home Wi-Fi network. When this happens, the data broker can use the IP address of the home network to identify the user's home, and append this to the unique profile it is compiling about the user.  If the user has a computer connected to the same network, this computer will have the same IP address. The data broker can then use the IP address to connect the computer to the same user, and identify that user when their IP address makes requests on other publisher pages within their ad network.  Now the data broker knows that the same individual is using both the phone and the computer, which allows it to track behavior across devices and target the user and their devices with ads on different networks.[93]

126.   Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[94]

127.   In other words, not only does the collection of IP addresses by Defendant cause harm in and of itself, the Defendant specifically attaches IP addresses to comprehensive user profiles, tracking Plaintiff and Class Members across the Internet using their IP addresses in conjunction with other data and compiling vast reams of other personal information in the process.

128.   For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[95]

129.   Likewise, under the California Consumer Privacy Act, IP addresses are considered "personal information" because they are "reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household."  Cal. Civ. Code § 1798.140(v)(1)(A).[96]

---

[93] TWETMAN & BERGMANIS-KORATS, *supra* at 11.

[94] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

[95] IS AN IP ADDRESS PERSONAL DATA?, CONVESIO, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/; *see also* WHAT IS PERSONAL DATA?, EUROPEAN COMMISSION, https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en.

[96] A "consumer" is defined as "a natural person who is a California resident."  Cal. Civ. Code § 1798.140(i).)  A "household" is defined as "a group … of consumers who cohabitate with one

---

**Mobile Advertising Identifiers**

130. Defendant employs similar methods to track individuals using mobile apps on Android and iOS devices.

131. Defendant owns and operates "software development kits" (SDKs)[97], pieces of code that work independently or with "application programming interfaces" (APIs) and are loaded into mobile apps and can track users' activity on certain apps.[98]

132. An SDK is a "set of tools for developers that offers building blocks for the creation of an application instead of developers starting from scratch … For example, Google Analytics provides an SDK that gives insight into user behavior, engagement, and cross-network attribution."[99]

133. An API "acts an intermediary layer that processes data transfer between systems, letting companies open their application data and functionality to external third-party developers [and] business partners."[100] An API can "work[] as a standalone solution or included within an SDK … [A]n SDK often contains at least one API."[101] APIs "enable[] companies to open up their applications' [or websites'] data and functionality to external third-party developers, business partners, and internal departments within their companies."[102]

134. The Sharethrough and Equativ SDKs track information including, but not limited to, users' device information, "such as device type (e.g., laptop, mobile, TV), model, manufacturer, operating system, time zone, telephone carrier information, network information (e.g., WIFI), and

another at the same residential address and share use of common devices or services." Cal. Civ. Code § 1798.140(1).)

[97] *Sharethrough CEO: 'The Best Way To Monetize Feeds Is With Branded Content'*, ADEXCHANGER, https://www.adexchanger.com/mobile/sharethrough-ceo-the-best-way-to-monetize-feeds-is-with-branded-content/ (Apr. 21, 2014).

[98] https://www.ibm.com/blog/sdk-vs-api/ ("SDK" stands for software development kit and "is a set of software-building tools for a specific program," while "API" stands for application programming interface) (last visited Dec. 23, 2024).

[99] API VS. SDK: THE DIFFERENCE EXPLAINED (WITH EXAMPLES), https://getstream.io/glossary/api-vs-sdk/.

[100] IBM, *What is an API?*, available https://www.ibm.com/topics/api.

[101] SDK VS. API: WHAT'S THE DIFFERENCE?, IBM (July 13, 2011), https://www.ibm.com/blog/sdk-vs-api/ ("SDK" stands for software development kit and "is a set of software-building tools for a specific program," while "API" stands for application programming interface).

[102] APPLICATION PROGRAMMING INTERFACE (API), https://www.ibm.com/cloud/learn/api.

mobile application information. Mobile device information includes standard mobile advertising identifiers located on every mobile device. These are: IDFA – advertising identifier used on Apple's iOS devices; and Google Advertising ID (AAID or GAID) – advertising identifier used on Android devices, to track your use of mobile apps on your device(s)."[103]

135.    Defendant admits to collecting advertising identifiers that are designed to track the app activity of individual users across different apps. Two of the most prominent are AAIDs (for Android devices) and IDFAs (for iOS devices) (collectively, "Mobile Advertising IDs" or "MAIDs").[104]

136.    An AAID is a unique string of numbers which attaches to a device.  As the name implies, an AAID is sent to advertisers and other third parties so they can track user activity across multiple mobile applications.[105]  So, for example, if a third party collects AAIDs from two separate mobile applications, it can track, cross-correlate, and aggregate a user's activity on both apps.

137.    Although technically resettable, an AAID is a persistent identifier because virtually no one knows about AAIDs and, correspondingly, virtually no one resets that identifier.  The fact that the use and disclosure of AAIDs is so ubiquitous evinces an understanding on the part of Defendant, Google, and others in the field that they are almost never manually reset by users (or else an AAID would be of no use to advertisers).  Byron Tau, Means of Control: How the Hidden Alliance of Tech and Government is Creating a New American Surveillance State at 175 (2024) ("Like me, most people had no idea about the 'Limit Ad Tracking' menu on their iPhones or the AAID that Google had given even Android devices.  Many still don't."); *see also Louth v. NFL Enterprises LLC*, 2022 WL 4130866, at *3 (D.R.I. Sept. 12, 2022) ("While AAID are resettable by users, the plaintiff plausibly alleges that AAID is a persistent identifier because virtually no one knows about AAIDs and, correspondingly, virtually no one resets their AAID.") (cleaned up).

138.    Using publicly available resources, an AAID can track a user's movements, habits,

---

[103] *User Rights Policy Notice*, SHARETHROUGH, https://privacy-center.sharethrough.com/en/consumer-privacy-notice/ (Aug. 2, 2024).

[104] *See id.*

[105] https://support.google.com/googleplay/android-developer/answer/6048248 (last visited Dec. 23, 2024).

---

and activity on mobile applications.[106]   Put together, the AAID serves as "the passport for aggregating all of the data about a user in one place."[107]

139.    Because an AAID creates a record of user activity, this data can create inferences about an individual, like a person's political or religious affiliations, sexuality, or general reading and viewing preferences.  These inferences, combined with publicly available tools, make AAIDs an identifier that sufficiently permits an ordinary person to identify a specific individual.

140.    Similarly, an "Identifier for Advertisers, or IDFA for short, is a unique, random identifier (device ID) that Apple assigns to every iOS device. An IDFA would be the equivalent of a web cookie, in the sense that it enables advertisers to monitor users' engagement with their ads, and keep track of their post-install activity."[108]

141.    As with the Sharethrough Cookies and AAID, Defendant's collection of IDFAs allows Defendant to track iOS users' activity across the various apps they use. Like the AAID, this data can create inferences about an individual, such as a person's political or religious affiliations, sexuality, or general reading and viewing preferences.  These inferences, combined with publicly available tools, sufficiently permit even an ordinary person to identify a specific individual with the IDFA.

142.    Regardless of whether these IDs are supposed to be anonymous, MAIDs are often combined with other identifiers to identify users in what is known as ID Bridging. "ID Bridging" is the process of "piecing together different bits of information about" a user "to confidently infer that it is the same individual accessing a publisher's site or sites from various devices or browsers."[109] That is, users can be identified and tracked by "bridging" (or linking) their MAIDs to other sources, such as e-mail addresses, geolocation, or phone numbers.

---

[106]https://www.huffingtonpost.co.uk/entry/using-just-1000-worth-of-mobile-adverts-you-can-effectively-track-anyone_uk_59e87ccbe4b0d0e4fe6d6be5 (last visited Dec. 23, 2024).

[107] https://digitalwatchdog.org/trend-report-apps-oversharing-your-advertising-id/ (last visited Dec. 23, 2024).

[108]https://www.appsflyer.com/glossary/idfa/ (last visited Dec. 23, 2024).

[109] Kayleigh Barber, *WTF Is The Difference Between Id Bridging And Id Spoofing?*, DIGIDAY (July 8, 2024, https://digiday.com/media/wtf-is-the-difference-between-id-bridging-and-id-spoofing/.

---



143.    ID Bridging "has long been the foundation of programmatic advertising,"[110] which is the process by which companies "use [] advertising technology to buy and sell digital ads" by "serv[ing] up relevant ad impressions to audiences through automated steps, in less than a second."[111] It entails a "unique identifier[] assigned to individual devices," including "Google's Advertising ID," personal information like geolocation and e-mail address, and "cross-platform linkage."[112]

144.    ID Bridging is a money-making machine for advertisers and app developers.  On the advertiser side, ID Bridging "increase the chances of an ad buying platform finding their inventory to be **addressable** and, therefore, maximizes their 'ad yields.'" (emphasis added) And on the app developer side, "publishers can boost revenue from direct-sold campaigns by offering advertisers access to more defined and valuable audiences."[113]

145.    In other words, advertisers will be able to find users that are more directly and likely interested in what is being sold by having access to significantly more information.  And app users'

[110] https://www.adexchanger.com/data-driven-thinking/how-can-id-bridging-the-foundation-of-our-space-suddenly-be-a-bad-thing/.

[111] PROGRAMMATIC ADVERTISING, https://advertising.amazon.com/blog/programmatic-advertising#.

[112] Anete Jodzevica, *ID Bridging: The Privacy-First Future of Audience Targeting*, SETUPAD (Nov. 15, 2024), https://setupad.com/blog/id-bridging/.  Ironically, the example given in this article is a "hashed e-mail," where the e-mail Defendant collected in this example is not hashed.

[113] Bennett Crumbling, *What Is 'ID Bridging' And How Publishers Use It To Grow Direct And Programmatic Revenue?*, OPTABLE (Aug. 22, 2024. https://www.optable.co/blog/what-is-id-bridging.

information will be more valuable (and therefore, bring in more money to app developers) because it is combined with a plethora of other information from various sources.

146.   Many companies (*e.g.*, data brokers, identity graph providers), publicly advertise their ability to conduct such bridging.  And Sharethrough itself has touted some of the benefits of ID Bridging, noting that it "aim[s] to empower brands to effectively target and measure audiences through our neutral and interoperable identity framework and by investing in leading cookieless solutions[.]"[114]

147.   Defendant also advertises that its clients can "[m]aximize [thei]r audience engagement by bringing your own marketing data to the equation and target them on the Sharethrough Exchange."[115] It calls this capability first-party data targeting.

148.   Defendant also advertises its third-party data targeting capabilities.

149.   This means that Defendant has the capability to analyze and then integrate advertisers' first-party data and third-party data into what it calls an "identity framework," which it then uses to help its clients target consumers.

150.   While Defendant does not explicitly label this functionality as "ID Bridging," it discusses the importance of "addressability" when it comes to targeted advertising. In fact, a whole section of Sharethrough's website is dedicated to "addressability," the same business problem that ID Bridging is meant to solve.[116]

151.   Put simply, ID bridging enables the supply-side to extend user identification beyond the scope of one browser or device.[117]

152.   Yet, while those within the ID Bridging industry describe it as privacy-protective, it

[114] *Implement our Cookieless Advertising Solutions for Enhanced Campaign Performance*, SHARETHROUGH, https://www.sharethrough.com/advertisers/cookieless-advertising#approach (last accessed Feb. 2026).

[115] *Id*.

[116] *Implement our Cookieless Advertising Solutions for Enhanced Campaign Performance*, SHARETHROUGH, https://www.sharethrough.com/advertisers/cookieless-advertising#approach (last accessed Feb. 2026).

[117] *See, e.g.*, Budi Tanzi, *New OpenRTB Specs Ensure Identity Resolution Can Be Done Transparently With Trusted Partners*, EXPERIAN (Dec. 18, 2024), https://www.experian.com/blogs/marketing-forward/new-openrtb-specs-ensure-identity-resolution-can-be-done-transparently-with-trusted-partners/.

is anything but. As courts have noted, the "ability to amass vast amounts of personal data for the purpose of identifying individuals and aggregating their many identifiers" creates "dossiers which can be used to further invade [users] privacy by allowing third parties to learn intimate details of [users'] lives, and target them for advertising, political, and other purposes, ultimately harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them." *Katz-Lacabe v. Oracle Am., Inc.*, 688 F. Supp. 3d 928, 940 (N.D. Cal. 2023) (cleaned up).

153. In February 2019, Oracle published a paper entitled "Google's Shadow Profile: A Dossier of Consumers Online and Real World Life," part of which provides as accurate a description of Google's services (and Equativ's, as Defendant):

> a consumer's "shadow profile" [is a] massive, largely hidden dataset[] of online and offline activities. This information is collected through an extensive web of … services, which is difficult, if not impossible to avoid. It is largely collected invisibly and without consumer consent. Processed by algorithms and artificial intelligence, this data reveals an intimate picture of a specific consumer's movements, socio-economics, demographics, "likes", activities and more. It may or may not be associated with a specific users' name, but the specificity of this information defines the individual in such detail that a name is unnecessary.[118]

154. In other words, ID Bridging is dangerous because of the sheer expanse of information being compiled by companies like Defendant without the knowledge or consent of users, all of which is being done for pecuniary gain.

## Other Identifiers

155. In addition to the methods described above, which are explicitly designed to track individuals across different devices and apps, Defendant collects other identifying information that allows it to identify the individual using the device and to add this web-activity information to a larger profile on the individual in order to sell their profile for targeted advertising.

---

[118] GOOGLE'S SHADOW PROFILE: A DOSSIER OF CONSUMERS ONLINE AND REAL WORLD LIFE at 1 (Feb. 2019), https://tinyurl.com/2mtuh7vf.

156.    One method is through collecting hashed e-mail addresses. [119]  The logic of this is straightforward. If Defendant collects the same e-mail address from two different site visits, it can determine with almost total accuracy that the sites are both being visited by the same person. The same is true of devices. If the same e-mail address is captured on two different devices, it is very likely those devices are used by the same individual.

157.    Even if Defendant was only collecting hashed[120] email addresses, the reality is that "the match between your email and its hash is probably already circulating widely and companies are marking money from it."[121]  Given the availability online of such "leaked" email/hashed email matches, entities are merely "pretend[ing]to protect your privacy"[122] through SHA-256 and/or other hashing algorithms.

158.    The Federal Trade Commission has warned companies for over a decade—including as recently as July 24, 2024—that hashing is an insufficient method of anonymizing information.[123]

159.    Thus, even in hashed form, email addresses are traceable to individuals.

160.    Location information functions in a similar manner.  If multiple websites or apps are visited from the same location, the pool of potential individuals who are accessing the website or app is narrowed considerably immediately and can be narrowed to a pinpoint over time.

161.    HTTP requests, when intercepted by Defendant, collect device information that can also identify whether the same user is visiting multiple sites or apps, and can distinguish between the

---

[119] *Brinztech Alert: Data of Sharethrough are on Sale*, BRINZTECH, https://www.brinztech.com/breach-alerts/brinztech-alert-data-of-sharethrough-are-on-sale/ (Jul. 9, 2025).

[120] DEFINITION OF HASH, https://www.pcmag.com/encyclopedia/term/hash.

[121] PIXEL DE TRACKING, GUERLAIN (LVMH): LUXURY AND SURVEILLANCE, https://www-pixeldetracking-com.translate.goog/fr/votre-email-comme-vecteur-de-surveillance-ultime-illustration-avec-guerlain?_x_tr_sl=fr&_x_tr_tl=en&_x_tr_hl=en&_x_tr_pto=sc.

[122] *Id.*

[123] Ed Felten, *Does Hashing Make Data "Anonymous"?*, Federal Trade Commission (Apr. 22, 2012), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2012/04/does-hashing-make-data-anonymous ("[H]ashing is vastly overrated as an 'anonymization' technique … the casual assumption that hashing is sufficient to anonymize data *is risky at best, and usually wrong.*") (emphasis added); *No, Hashing Still Doesn't Making Your Data Anonymous*, Federal Trade Commission (July 24, 2024) ("[H]ashes aren't 'anonymous' and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized.").

---

devices being used by a particular person.  With every visit, and every subsequent HTTP request, the device information will be identical in each.

### 2.    Interception of Communications

162.    In addition to collecting a myriad of identifiers, Defendant's Advertising Partners' tags and tag manager solutions collect consumers' "clickstream data."[124]

163.    "Clickstream data refers to any information obtained from an Internet user's online activities, including the search terms they used, web pages they visited, and links they clicked. Clickstream data helps websites keep track of a buyer's journey from the first time they searched for an item and the landing page they visited to actual purchase or cart abandonment."[125]

164.    A Universal Resource Locator (URL) is a common example of clickstream data.

165.    There is a Universal Resource Locator for each webpage visited by a consumer. Sometimes known as a "web address," the URL is the name of the webpage as displayed in the address bar of a browser.

166.    Each page on a website has its own individual URL, allowing tags with access to the URL to see which pages of a website a particular internet user visited.

167.    All URLs identify the pages of each page of a website an internet user visited.

168.    For example, when viewing an article on the Buzzfeed website, the full name of the Article is included in the URL:



---

[124] *User Rights Policy Notice*, SHARETHROUGH, https://privacy-center.sharethrough.com/en/consumer-privacy-notice/ (Aug. 2, 2024).

[125] What is Clickstream Data?, TECHSLANG, HTTPS://WWW.TECHSLANG.COM/DEFINITION/WHAT-IS-CLICKSTREAM-DATA/ (Jul. 6, 2023).

```
"site": {
        "domain": "buzzfeed.com",
        "page": "https://www.buzzfeed.com/angelicaamartinez/clever-true-crime",
        "ref": "https://www.buzzfeed.com/",
        "publisher": {
                "domain": "buzzfeed.com"
        }
```

169.    As such, any tag that intercepts the URL on this page also intercepts the titles of the content the users view.  This process works similarly on other websites.

170.    Defendant, through its Advertising Partners' tags and tag manager solutions, collects the URLs and any information that can be gleaned or inferred from those URLs are added to the profiles that Defendant has for that particular user.

171.    Consistent with the design of the Sharethrough Tracker, the URL information (and all other information) is intercepted contemporaneously when the information is communicated to a particular website or app. The information is automatically processed immediately and added to Defendant's existing data profiles or is used to create a new profile. Such processing happens at the time of the interception, so that the information can be immediately shared with other advertisers.

### 3.    Identity Resolution

172.    In addition to its own tracking of individuals across the internet, Defendant engages in a process known as identity resolution – what it calls Audience-Based Targeting or Sharethrough Audience Solutions. Audience targeting allows Defendant's clients the ability to "understand their audiences on a granular level" and allows "advertisers to create highly targeted and actionable personas based on behaviors, value, and intent."[126]

173.    Identity resolution is the technology marketing term for the process of data tracking described above. As Defendant describes it:

> We have access to demographics, psychographics, interests, online behaviors, media consumption, purchasing habits, and brand

---

[126] *Rethinking Premium Inventory: A Q&A with Sharethrough on Quality, Sustainability, and Smarter Targeting*, DIGILANT, https://digilant.com/blog/rethinking-premium-inventory-with-sharethrough/ (Apr. 10, 2025).

affinities. This data, collected from a respondent pool representing 50+ markets, allows us to share the latest consumer attitude trends, motivations, and decision-making processes.

We also offer bespoke audience segmentation, enabling advertisers to create highly targeted and actionable personas based on behaviors, value, and intent and conduct our own research to gain greater insights into the topics that we know advertisers care about […]

Our research platform provides comprehensive insights that reveal the behaviors, preferences, and motivations of diverse, unique, and hard-to-reach audiences. By analyzing data across demographics, cultural backgrounds, niche interests, and emerging trends, we help brands go beyond traditional targeting methods to segment and engage audiences effectively.

With a combination of global and local market data, we provide advertisers with deeper insights into underrepresented groups, high-intent consumers, and emerging subcultures. Our platform also tracks digital behaviors across multiple touchpoints, allowing advertisers to identify where these audiences are most active.[127]

174.    In plain language, identity resolution is the culmination of Defendant's and its Advertising Partners' tracking, where Defendant matches an App or Website user to a larger record of their web and app activity for the purpose of targeted advertising. For Defendant's customers, this involves uploading their lists of customers and matching it to Defendant's data.

175.    Once sufficient data has been collected on an individual, Defendant monetizes the individual's data in a number of ways. One way is to provide individuals' identities and web browsing information to its Advertising Partners to assist with those companies' serving targeted ads to internet users.

176.    When an Advertising Partner interacts with the Sharethrough Tracker on a website, Defendant (in addition to the independent tracking described above) interacts with the DSP and DMP and tag manager solutions and allows those DMPs and DSPs to access the information associated with each individual.

---

[127] *Id.*

177. With respect to the delivery of targeted advertisements on websites, Defendant's ID syncing makes the entire real-time-bidding process possible by identifying the individual visiting the site and providing information about their web activity and interests. This creates the basis for hyper-targeted advertising related to that activity and those interests to be served. This ultimately benefits the website or app operator, as it makes their userbase more valuable because said users have been further identified and linked to other activity via the tags and tag manager solutions.

178. For these processes to happen, Defendant must necessarily share the information it collects on individual internet users with its partners.

179. The identity resolution service aids in the wiretapping and surveillance conducted by the Advertising Partners.

180. Defendant uses the data it collects for other uses besides real-time bidding. For example, Defendant also operates a CTV ad service, which is used to serve ads to viewers of streaming platforms.

181. Defendant admits that ad "[c]ampaigns are selected in real time, based on audience data and targeting."[128]

182. Defendant also uses the improperly collected data for its "Maestro" AI co-planner, which is "[b]uilt on Equativ's SSP infrastructure" to, among other things, "prioritize…the most relevant audience segments for each [ad] campaign."[129]

### 4. Defendant Intentionally Hides Its Data Deletion Page

183. Defendant is aware consumers do not consent to its mass collection of their personal data and takes steps to hide its legally required deletion page from the small number of consumers who know that the tracking is taking place at all.

184. A recent report by The Markup and Wired Magazine found "[m]ore than 30 of the companies [including Sharethrough], which collect and sell consumers' personal information, hid

---

[128] https://www.equativ.com/publishers/ctv.

[129] *Equativ Launches Media Planning Agent to Enhance Buyer Efficiency and Boost Campaign Outcomes*, Equativ, https://www.equativ.com/press/equativ-launches-media-planning-agent-to-enhance-buyer-efficiency-and-boost-campaign-outcomes (December 9, 2025).

their deletion instructions from Google" by using "code to tell search engines to remove the page entirely from search results."[130]

185.   Notably, Defendant did not respond for comment and did not change its practice of hiding the page following the investigation.[131]

## III.   DEFENDANT'S TRACKERS ARE PRESENT ON EACH OF THE SUBJECT WEBSITES AND ACROSS THE INTERNET

186.   As part of their investigation, Plaintiff's counsel found and conducted testing on several websites to provide a sample of the widespread tracking and wiretapping of, and targeted advertising to, millions of Americans by Defendant.  For each of the websites tested, there are hundreds or thousands of others where the same or similar information is collected.

187.   Thus, the conduct alleged in this Complaint is *not* limited to the specific websites alleged below.  Indeed, even Plaintiff himself visited other websites where Defendant would have tracked him.  Instead, these websites are merely examples of the types of data that Defendant collects, and the ways in which it surveils users across the Internet.

### A.   Buzzfeed

188.   Buzzfeed is a popular website that provides articles and quizzes related to popular culture.

189.   The website also contains ad space where companies, like Defendant, facilitate the real-time bidding process to hyper-target advertisements to individual website users based on data collected about their browsing activity and other activity.

190.   Unbeknownst to website visitors, the Sharethrough Tracker is loaded onto each page of the Buzzfeed website.

> 200   POST btlr.sharethrough.com
> Thu Feb 06 11:24:28 EST 2025

---

[130] *We caught companies making it harder to delete your personal data online*, The Markup, https://themarkup.org/privacy/2025/08/12/we-caught-companies-making-it-harder-to-delete-your-data (August 12, 2025).

[131] *Id.*

191. The Sharethrough Tracker also immediately loads tracking cookies onto the individual's browser in the manner described herein.

**Cookies:**
stx_user_id     d08b5a53-f126-44f7-9d31-52b0de636ca5

192. The Sharethrough Tracker also intercepts the individual's IP address in the manner described herein.

**Data:**
source_id       f832af09fdaea37e940528ab
source_user_id       0-0ca9aa4f-1d3f-5aec-4632-c6b16a0a5efe$ip$12.█████
gdpr   0
gdpr_consent

193. The Sharethrough Tracker also intercepts the detailed, full-string URL from each page of the Buzzfeed website a user visits, as detailed above, thereby intercepting the user's communications with the website regarding which articles they want to view.

```
"site": {
        "domain": "buzzfeed.com",
        "page": "https://www.buzzfeed.com/angelicaamartinez/clever-true-crime",
        "ref": "https://www.buzzfeed.com/",
        "publisher": {
                "domain": "buzzfeed.com"
        }
```

194. The Sharethrough Tracker also collects the user's browser and device information in the manner described above.

```
        },
        "device": {
                "ua": "Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like
Gecko) Chrome/132.0.0.0 Safari/537.36",
                "language": "en-US",
                "js": 1,
                "dnt": 0,
                "h": 1728,
                "w": 3072,
                "ext": {
```

195. Defendant also facilitates real-time bidding options on the Buzzfeed website, meaning that the information Defendant collects on a particular Buzzfeed website user is shared with numerous prospective bidders. In the example below, Defendant's "BLTR" auction service running a real-time bidding auction for a video ad.

```
"id": "2347953e3e611af",
"tagid": "wybUu9ZQhY52vPJuHC5dEoHS",
"secure": 1,
"bidfloor": 1.65,
"ext": {
    "tid": "bdab6277-562d-4e16-aa34-b7d70790b987",
    "gpid": "/23bdb39b/buzzfeed/angelicaamartinez/Desktop"
},
"video": {
    "pos": 0,
    "topframe": 0,
    "skip": 1,
    "linearity": 1,
    "minduration": 0,
    "maxduration": 49,
    "playbackmethod": [6],
    "api": [1, 2],
    "mimes": ["video/mp4", "video/webm", "application/javascript", "video/ogg", "video/mpeg"],
    "protocols": [2, 3, 5, 6],
    "w": 600,
    "h": 338,
```

196. In addition to the sharing of information involved in facilitating the auction, Defendant engages in further cookie syncing on the Buzzfeed website. For example, the image below shows the Sharethrough Tracker syncing with the "Adsrvr" tracker, which is owned by The Trade Desk, an identity graph provider.

```
"https://match.adsrvr.org/track/cmf/generic?ttd_pid=sharethrough&ttd_tpi=1&gdpr=0&gdpr_consent=",
    "https://ssbsync.smartadserver.com/api/sync?callerId=47&gdpr=0&gdpr_consent=",
```

197. Defendant then uses the information it collects to link the user to a de-anonymized profile and adds any new information to that profile. This profile is connected to the ID assigned to the individual and added to Defendant's data products described herein. This data added to an individual's profile increases its value to advertisers—who can serve ads related to these keywords,

sentiments, and information viewed—and enriches Buzzfeed—as its users are more valuable now that their information is being connected to Defendant's vast repository of information.

198.    In addition, because of the setting of cookies and collecting of the user's device information and IP address, Defendant tracks the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers as part of the real-time-bidding advertising process.

**B.    Zillow**

199.    Zillow is a popular real estate website where visitors can search for housing to rent or buy.

200.    Unbeknownst to website visitors, the Rubicon Project Tracker, owned by data broker Magnite, Inc. is loaded onto the Zillow website.

```
:method: POST
:authority: prebid-a.rubiconproject.com
:scheme: https
:path: /event
content-length: 2620
sec-ch-ua-platform: "Windows"
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko
Chrome/131.0.0.0 Safari/537.36
sec-ch-ua: "Google Chrome";v="131", "Chromium";v="131", "Not_A Brand";v="24"
content-type: application/json
sec-ch-ua-mobile: ?0
accept: */*
origin: https://www.zillow.com
sec-fetch-site: cross-site
sec-fetch-mode: cors
sec-fetch-dest: empty
referer: https://www.zillow.com/homedetails/7300-SW-16th-St-Miami-FL-33155/44184407_zpid/
accept-encoding: gzip, deflate, br, zstd
accept-language: en-US,en;q=0.9
priority: u=1, i
```

201.    As the above data shows, Magnite intercepts the detailed, full-string URL of each property viewed, therefore intercepting each property selection by the user in real time.

202.    The Rubicon Project tracker also calls Defendant's Sharethrough Tracker onto the Zillow website. The Sharethrough Tracker provides identity resolution to Magnite to help Magnite identify and profile the person who made the selection on the Zillow website.

203.    Once on the Zillow website, the Sharethrough Tracker also engages in its own tracking. The Sharethrough Tracker loads cookies onto the user's browser in the manner described above.

```
200    GET    match.sharethrough.com
/sync/v1?source_id=UiRtTsXAfjmfSDAKnR1FjWsu&source_user_id=M477FU9H-X-BFUR
Fri Jan 03 18:04:20 EST 2025

Cookies:
stx_user_id    d08b5a53-f126-44f7-9d31-52b0de636ca5
sec-fetch-dest: image
sec-fetch-mode: no-cors
sec-fetch-site: cross-site
sec-fetch-storage-access: active
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko)
Chrome/141.0.0.0 Safari/537.36
```

204.    The Sharethrough Tracker also collects the individual's browser and device information as described above.

205.    The Sharethrough Tracker is also ID syncing with and providing identity resolution to multiple other Partner Pixels on the Zillow website.

206.    Defendant adds the information it intercepts and receives from the Partner Pixels to its profile on the individual. This profile is connected to the ID assigned to the individual and added to Defendant's data products described herein. This data added to an individual's profile increases its value to advertisers—who can serve ads related to real estate and specific to the geolocations searched to the individual—and enriches Zillow—as its users are more valuable now that their information is being connected to Defendant's vast repository of information and user profiles.

207.    Defendant, because of the setting of cookies and collecting of the user's device information and IP address, tracks the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers as part of the real-time-bidding advertising process.

IV.    **DEFENDANT'S SERVICES DEANONYMIZE USERS AND ENRICH DEFENDANT AND THE WEBSITE OPERATORS THROUGH REAL-TIME BIDDING AND PROFILING INDIVIDUALS**

A.    **Defendant Combines The Data From The Subject Websites With Other Data To Deanonymize Users**

208.    As a result of Equativ's technology being deployed on thousands or millions of websites, Defendant is collecting various forms of personal information and web activity records of nearly every American and sells that data to target advertising.

209.    The information collected, on its own, is enough to identify the individual internet user.  But this is only the first step in Defendant's practices of dragnet surveillance.

210.    With Equative's user ID syncing processes, Defendant not only has access to its own information that it tracks from Internet users, but also the information that its partner advertisers track.[132]  In this way, Defendant amasses and aggregates Internet users' data and sells it back to its partner advertisers.

211.    Defendant has a whole suite of identity products for this purpose and its data products enable companies to target specific people.

B.    **The Partner Trackers Use The Profiles Created By Defendant To Enhance Their Advertising And Analytics Services**

212.    In addition to contributing vast amounts of data to Defendant's data profiles, the data collected by Defendant is utilized by both it and the Partner Trackers to conduct hyper-targeted advertising through the real-time bidding process.

213.    The identity resolution process is a key part of a complex ecosystem of pixels that deliver detailed user information to advertisers to increase the efficiency of those advertisements.

214.    Further, the delivery of advertisements facilitated by Defendant, involves the sharing of vast amounts of consumer information with Partner Trackers.

215.    When Defendant shares website visitor information with a Partner Tracker, that partner (i) uses the information provided by Defendant to add information to its own data and

---

[132] *Id*.

advertising datasets and (ii) shares the identity information with other advertisers during the real-time bidding delivery of advertisements.

216. For ads to be delivered as soon as a website user visits a site, multiple technology companies need access to detailed information about the identity and interests of the individual website visitor.

217. This information is provided by the Partner Trackers, who use Defendant's identity resolution services or advertising services (which they pay for) to create and expand their own datasets, which they in turn disclose to other players in the real-time bidding ecosystem as advertisements are delivered on websites.

218. Each time a user is selected by this network of advertisers to receive an ad, the advertisers "bid" on the user—meaning Defendant or the Partner Trackers are paid for the information they have stored about that user. Millions of these bids are made per day across the Internet, demonstrating the immense value of the data Defendant improperly collects on Plaintiff and Class Members.

219. As such, the improper collection of vast amounts of data on Plaintiff and Class Members is done both for Defendant's profit and for the profit of the Partner Trackers.

220. Defendant's business model has nothing to do with maintaining any of its customers' websites. Defendant's technology is used for the sole purpose of collecting data and selling that data to target advertising. As described above, the data collected about an individual from a website is not only used by the operator of the website, but is used by Defendant across the internet and is sold to numerous data brokers and online advertisers who have no connection whatsoever to the original website.

## V. PLAINTIFF'S EXPERIENCE

221. Plaintiff Ken Zhu visited at least 29 websites while in California where the Sharethrough Tracker was present, including websites where Defendant could discover sensitive information about Plaintiff Zhu, such as Zillow.com, Rocketmortgage.com, and Vanguard.com.

222. Unbeknownst to Plaintiff Zhu, the Sharethrough Tracker was loaded onto each website.

---

223.    Using the Sharethrough Tracker, Defendant tracked Plaintiff Zhu in each of the ways described above, including tracking his selections and communications in real time, loading tracking cookies onto his browser, compiling his data into a profile for sale, and sharing his information with other data brokers and identity graph providers.

224.    Defendant provided Partner Trackers with identity resolution services so that those entities could deanonymize the data it collected on Plaintiff Zhu, bolster their own data profiles, and sell his information during the real-time-bidding process.

225.    Defendant used the Sharethrough Tracker to:

(a)    identity Plaintiff Zhu and either create a new profile of him or match him to a pre-existing profile (either in the Defendant's own databases or with another entity's profile);

(b)    enable the websites and Partner Trackers to sell Plaintiff Zhu's information to advertisers for hyper-targeted advertising based on the information collected by the Sharethrough Tracker on the websites and the information contained on any profiles of Plaintiff (which are linked to Plaintiff via the information collected by Defendant on the websites);

(c)    enable the websites and Partner Trackers to target Plaintiff with advertisements and serve advertisements on him based on the information collected and the information contained on any profiles of Plaintiff (which are linked to Plaintiff via the information collected by Defendant on the websites); and

(d)    de-anonymize Plaintiff and generate revenue from the sale of his information—both what is collected on the websites and the profiles this information is linked to—to advertisers, thus boosting the websites' revenue and the value of Defendant's services.

226.    Defendant also, by using the cookies loaded onto Plaintiff's browser, tracked his future web browsing activity across the internet and assisted other Partner Trackers in tracking him and wiretapping her communications with websites.

227.    Plaintiff was unaware that Defendant was installing trackers on his browser, intercepting his communications with websites, aiding in the wiretapping of his communications, deanonymizing his personal data, or collecting, selling, and disclosing his personal data, to

advertising technology companies, other data brokers, or any person or entity doing business with Defendant.  Nor could Plaintiff have discovered these facts.

228. Plaintiff did not provide prior consent to Defendant to install trackers on his browser, aid in the wiretapping of his communications, deanonymize his personal data, or collect, sell, and disclose his personal data, to advertising technology companies, other data brokers, or any person or entity doing business with Defendant.  Nor did Defendant obtain a court order to do the same.

229. Plaintiff has, therefore, had his privacy invaded by Defendant's violations of the CIPA and ECPA, and Defendant has been unjustly enriched by enabling the disclosure and sale of the improperly collected data concerning Plaintiff Zhu.

## CLASS ALLEGATIONS

230. **Class Definition:** Plaintiff seeks to represent a class of similarly situated individuals defined as follows:

> All persons in the United States whose personal information, communications, or private information, or data derived from their personal information, communications, or private information, was used to create a profile and/or made available for sale or use through Defendant's platform, distributed or sold in the process of delivering advertising on websites, mobile applications, or other digital media, or otherwise.

231. **California Subclass**: Plaintiff also seeks to represent a subclass of similarly situated individuals defined as follows:

> All California residents whose personal information, communications, or private information, or data derived from their personal information, communications, or private information, was used to create a profile and/or made available for sale or use through Defendant's platform, distributed or sold in the process of delivering advertising on websites, mobile applications, or other digital media, or otherwise.

232. The Class and California Subclass shall be collectively referred to as the "Classes," and Members of the Class and Subclass will collectively be referred to as "Class Members," unless it is necessary to differentiate them.

---

233. Excluded from the Classes are Defendant, any affiliate, parent, or subsidiary of any Defendant; any entity in which any Defendant has a controlling interest; any officer director, or employee of any Defendant; any successor or assign of any Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

234. **Numerosity**. Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff currently; however, it is estimated that there are tens or hundreds of millions of individuals in the Classes. The identity of such membership is readily ascertainable from Defendant's records and non-party records, such as those of Defendant's customers and advertising partners.

235. **Typicality**. Plaintiff's claims are typical of the claims of the Classes. Plaintiff, like all Class Members, had his information collected and made available for sale by Defendant using comprehensive user profiles compiled about Plaintiff.

236. **Adequacy**. Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Classes. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation generally and in the field of digital privacy litigation specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Classes.

237. **Commonality/Predominance**. Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual members because Defendant has acted on grounds generally applicable to the Classes. Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Classes include:

   (a) Whether Defendant's acts and practices alleged herein constitute egregious breaches of social norms;

   (b) Whether Defendant acted intentionally in violating Plaintiff's and Class Members' privacy rights under the California Constitution or common law;

(c)     Whether Plaintiff and Class Members are entitled to damages under the ECPA, CIPA or any other relevant statute;

238.   **Superiority**: Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff knows of no special difficulty to that would be encountered by litigating this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### COUNT I
### Intrusion Upon Seclusion

239.   Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

240.   Plaintiff brings this claim individually and on behalf of the Classes against Defendant.

241.   Plaintiff brings this claim pursuant to California law.

242.   To state a claim for intrusion upon seclusion "[Plaintiff] must possess a legally protected privacy interest … [Plaintiff's] expectations of privacy must be reasonable … [and Plaintiff] must show that the intrusion is so serious in 'nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms." *Hernandez v. Hillsides, Inc*. 47 Cal. 4th 272, 286-87 (2009).

243.   Plaintiff and Class Members have an interest in: (i) precluding the dissemination and/or misuse of their sensitive, confidential communications and information; and (ii) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to highly intrusive surveillance at every turn.

244. By conducting such widespread surveillance, Defendant intentionally invaded Plaintiff's and Class Members' privacy rights, as well as intruded upon Plaintiff's and Class Members' seclusion.

245. Plaintiff and Class Members had a reasonable expectation that their communications, identities, personal activities, and other data would remain confidential.

246. Plaintiff and Class Members did not and could not authorize Defendant to intercept data on every aspect of their lives and activities.

247. The conduct described herein is highly offensive to a reasonable person and constitutes an egregious breach of social norms, specifically including the following:

a. Defendant engages in widespread data collection and interception of Plaintiff's and Class Members' internet and app activity, including their communications with websites and apps, thereby learning intimate details of their daily lives based on the massive amount of information collected about them.

b. Defendant combines the information collected on websites and apps with offline information also gathered on individuals to create the profiles used in the identity graphs and data products described herein.

c. Defendant creates comprehensive profiles based on this online and offline data, which violates Plaintiff's and Class Members' common law right to privacy and the control of their personal information.

d. Defendant sells or discloses these profiles, which contain the improperly collected data about Plaintiff and Class Members, to an unknown number of advertisers for use in the real-time-bidding process, which likewise violates Plaintiff's and Class Members' common law right to privacy and the control of their personal information.

248. Defendant's amassment of electronic information reflecting all aspects of Plaintiff's and Class Members' lives into profiles for future or present use is in and of itself a violation of their right to privacy considering the serious risk these profiles pose to their autonomy.

249. In addition, those profiles are and can be used to further invade Plaintiff's and Class Members' privacy by, for example, allowing third parties to learn intimate details of their lives and

target them for advertising, political, and other purposes, as described herein, thereby harming them by selling this data to advertisers and other data brokers without their consent.

250. Accordingly, Plaintiff and Class and California Subclass Members seek all relief available for invasion of privacy claims under common law.

**COUNT II**
**Violation Of The California Invasion of Privacy Act**
**Cal. Penal Code § 631(a)**

251. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

252. Plaintiff brings this claim individually and on behalf of the California Subclass against Defendant.

253. The California Legislature enacted the CIPA to protect certain privacy rights of California citizens. The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

254. The California Supreme Court has repeatedly stated the "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*." *Ribas*, 38 Cal. 3d at 363 (emphasis added, internal quotations omitted). This restriction is based on the "substantial distinction … between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an unannounced second auditor*, whether that auditor be a person or mechanical device." *Id*. at 361 (emphasis added). Such "simultaneous dissemination" "denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements." *Id*.; *see also Reporters Committee for Freedom of Press*, 489 U.S. at 763 ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

255. Further, "[t]hough written in terms of wiretapping, Section 631(a) applies to Internet communications." *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022).

Indeed, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013). This accords with the fact that "the California Supreme Court has [] emphasized that all CIPA provisions are to be interpreted in light of the broad privacy-protecting statutory purposes of CIPA." *Javier*, 2022 WL 1744107, at *2. "Thus, when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

256. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

257. To avoid liability under CIPA § 631(a), a defendant must show it had the consent of

*all* parties to a communication, and that such consent was procured *prior to* the interception occurring. *See Javier*, 2022 WL 1744107, at \*2.

258. Defendant's Trackers, various pixels and SDKs are each a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

259. Defendant is a "separate legal entity that offers [a] 'software-as-a-service' and not merely [] passive device[s]." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, Defendant has the capability to use the wiretapped information for a purpose other than simply recording the communications and providing the communications to website operators. Accordingly, Defendant was a third party to any communication between Plaintiff and California Subclass Members, on the one hand, and any of the websites at issue, on the other. *Id*. at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

260. At all relevant times, Defendant and the Partner Trackers willfully and without the consent of all parties to the communication, and in an unauthorized manner, read, attempted to read, and learned the contents of the electronic communications of Plaintiff and California Subclass Members, on the one hand, and the websites at issue, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

261. At all relevant times, Defendant uses those intercepted communications, including but not limited to building comprehensive user profiles that are offered for disclosure or sale in real-time bidding to prospective advertisers.

262. Further, Defendant "[a]ids, agrees with, employs, or conspires with" each Partner Tracker that it provides identity resolution to and who intercepts Plaintiff's and California Subclass Members' confidential communications, in that Defendant enables these Partner Trackers to identify the user behind any specific communication. *See Semien v. Pubmatic Inc.*, 2026 WL 216333, at \*9 (N.D. Cal. Jan. 27, 2026) ("PubMatic's identity resolution aids partner pixels in violating the first three clauses of § 631(a).").

263. Plaintiff and California Subclass Members did not provide their prior consent to Defendant's intentional interception, reading, learning, recording, collection, and usage of their electronic communications.

264. The wiretapping of Plaintiff and California Subclass Members occurred in California, where Plaintiff and California Subclass Members accessed the websites, where Defendant's Tracker was loaded on Plaintiff's and California Subclass Members' browsers, and where Defendant routed Plaintiff's and California Subclass Members' electronic communications to Defendant's servers.

265. Pursuant to Cal. Penal Code § 637.2, Plaintiff and California Subclass Members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

## COUNT III
### Violation Of The California Invasion Of Privacy Act,
### Cal. Penal Code § 632

266. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

267. Plaintiff brings this claim individually and on behalf of the proposed California Subclass against Defendant.

268. Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication."

269. Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

270. Plaintiff's and Class members' communications to websites and mobile applications, including their sensitive personal information, were confidential communications for purposes of § 632, because Plaintiff and Class Members had an objectively reasonable expectation of privacy in this data.

271. Plaintiff and Class Members expected their communications to be confined to the websites and mobile applications in part, due to the protected nature of the information at issue. Plaintiff and Class Members did not expect Defendant to secretly eavesdrop upon or record this confidential information and their communications.

272. Defendant's tracking technology, i.e., the Sharethrough Tracker and Sharethrough Cookies, are all electronic amplifying or recording devices for purposes of § 632.

273. By contemporaneously intercepting and recording Plaintiff's and Class Members' confidential communications to websites and mobile applications through this technology, Defendant eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

274. At no time did Plaintiff or Class Members consent to Defendant's conduct, nor could they reasonably expect that such a vast swath of their online communications would be overheard or recorded by Defendant.

275. Defendant utilized Plaintiff's and Class Members' sensitive personal and financial information for its own purposes, including for the construction of profiles and for targeted advertising.

276. Plaintiff and Class Members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief.

277. Plaintiff and Class Members have also suffered irreparable injury from these unauthorized acts. Plaintiff's and Class Members' sensitive data has been collected, viewed, accessed, stored, compiled, and widely sold and disseminated by Defendant, have not been destroyed, and due to the continuing threat of such injury, have no adequate remedy at law. Plaintiff and Class Members are accordingly entitled to injunctive relief.

**COUNT IV**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 638.51(a)**

278. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

279. Plaintiff brings this claim individually and on behalf of the proposed California Subclass against Defendant.

280. CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

281. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

282. A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

283. In plain English, a "pen register" is a "device or process" that records *outgoing* information, while a "trap and trace device" is a "device or process" that records *incoming* information.

284. For example, if a user sends an email, a "pen register" might record the email address it was sent from, because this is the user's *outgoing* information. On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from, because this is *incoming* information that is being sent to that same user.

285. Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line. As technology has advanced, however, courts have expanded the application of these surveillance devices. Indeed, Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013).

286. Accordingly, courts have applied the CIPA to internet tracking technologies, including CIPA § 638.50, to trackers similar to Defendant's here. *See, e.g.*, *Deivaprakash v. Condé Nast Digital*, --- F. Supp. 3d ---, 2025 WL 2541952, at *2-3 (N.D. Cal. Sept. 4, 2025) (finding tracker that collected IP address and device information was a "pen register" within the meaning of CIPA);

*Fregosa v. Mashable, Inc.*, 2025 WL 2886399, at *1, *5-6 (N.D. Cal. Oct. 9, 2025) (same); *Shah v. Fandom, Inc*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024) (same); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3-4 (N.D. Cal. Dec. 12, 2024) (same); *Riganian v. LiveRamp Holdings, Inc.*, 2025 WL 2021802, at *11-12 (N.D. Cal. July 18, 2025) (same); *Scarlett v. Future US, LLC*, 2025 WL 2614587, *4-5 (San Francisco Cnty. Super. Ct. Sept. 5, 2025) (same); *Rose v. Variety Media, LLC*, 2025 WL 2794920, at *2-3 (Los Anges Cnty. Super. Ct. Sept. 24, 2025) (same); *Lesh v. Cable News Network, Inc.*, 767 F. Supp. 3d 33, 40-42 (S.D.N.Y. 2025) (Marrero, J.) (finding trackers similar to those here are "pen registers" under the CIPA); *Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."); *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023) (referencing CIPA's "expansive language" when finding software was a "pen register");

287.    The Sharethrough Trackers installed on Plaintiff's and California Subclass Members' browsers are "pen registers" because they are "device[s] or process[es]" that "capture" the "routing, addressing, or signaling information"—the IP address, geolocation, device information, and other persistent identifiers—from the electronic communications transmitted by Plaintiff and California Subclass Members' computers or smartphones.  Cal. Penal Code § 638.50(b).

288.    At all relevant times, Defendant used the Sharethrough Trackers—which are pen registers—installed on Plaintiff's and California Subclass Members' browsers, which enabled Defendant to collect Plaintiff and California Subclass Members' IP addresses, geolocation, device information, and other persistent identifiers from the websites they visited.  Defendant used the Trackers to build comprehensive user profiles, which were used to unjustly enrich Defendant and its clients by linking and enhancing Plaintiff's and California Subclass Members' data when it is provided to advertisers through the real-time bidding process.

289.    Plaintiff and California Subclass Members did not provide their prior consent to Defendant's installation or use of the Sharethrough Tracker or any other tracking technology at issue.

290.    Defendant did not obtain a court order to install or use the Sharethrough Tracker, pixels or other tracking technology at issue.

291.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and California Subclass Members have been injured by Defendant's violations of CIPA § 638.51(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 638.51(a).

**COUNT V**
**Violation of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200, *et seq*.**

292.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

293.    Plaintiff brings this claim individually and on behalf of the Class against Defendant and on behalf of the California Subclass against Defendant.

294.    In both cases, Plaintiff brings this claim pursuant to California law.

295.    By committing the acts and practices alleged herein, namely surreptitiously surveilling and compiling profiles on Plaintiff and Class Members and selling that information to numerous entities for advertising, Defendant violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.* as to Plaintiff and the Class, by engaging in unlawful and unfair conduct.

296.    Defendant violated the UCL's proscription against engaging in **unlawful business practices** as a result of its violations of (1) the Electronic Communications Privacy Act, 18 U.S.C. §§ 2511(1); (2) the California Invasion of Privacy Act, Cal. Pen. Code §§ 631, 632, and 638.51; and (3) The California Constitution and common law.

297.    Defendant's acts and practices described above also violate the UCL's proscription against engaging in **unfair business practices.**  Defendant intentionally surveilled nearly every area of Plaintiff's and Class Members' lives, created permanent, non-anonymous profiles using that information, and sold that information to an unknown number of entities. Defendant's conduct is thus substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive and unscrupulous as the gravity of the conduct outweighs any alleged benefits.

298.    Pursuant to California Business and Professional Code § 17203, Plaintiff and Class Members seek an order of this Court that includes, but is not limited to, requiring Defendant to: (a) provide restitution to Plaintiff and Class Members; (b) disgorge all profits obtained as a result of its

violations of the UCL; and (c) pay Plaintiff's and the Class's attorneys' fees and costs.

299.    To the extent Plaintiff does not have an adequate remedy at law, they plead their claims under the UCL in the alternative to their legal claims. Legal remedies available to Plaintiff and Class Members are inadequate because they are not equally prompt and certain and in other ways as efficient as equitable relief. Damages are not as equally certain as restitution because the standard that governs restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiff failed to sufficiently adduce evidence to support an award of damages. Damages and restitution are not the same amount. Equitable relief, including restitution, entitles Plaintiff to recover all profits from the wrongdoing, which may exceed the available damages at law.

**COUNT VI**
**Violation of the Electronic Communications Privacy Act**
**18 U.S.C. §§ 2511(1), *et seq.***

300.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

301.    Plaintiff brings this claim individually and on behalf of the Class against Defendant and on behalf of the Class against Defendant.

302.    The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

303.    The ECPA protects both the sending and the receipt of communications.

304.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

305.    The transmission of Plaintiff's website page visits, selections, purchases, searches, and persistent identifiers to each website each qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

306.    The transmission of this information between Plaintiff and Class members and each website or app with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio,

electromagnetic, photoelectronic, or photo optical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

307. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

308. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

309. The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication." 18 U.S.C. § 2510(5).

310. The following instruments constitute "devices" within the meaning of the ECPA:

- The Sharethrough Tracker;
- The Equativ Tracker;
- Any other tracking code or SDK used by Defendant;
- Each Partner Tracker;
- The plan Defendant carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website.

311. Plaintiff's and Class Members' interactions with each website are electronic communications under the ECPA.

312. By utilizing the Trackers, as described herein, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class members in violation of 18 U.S.C. § 2511(1)(a).

313. Defendant intercepted communications that include, but are not limited to, communications to/from Plaintiff and Class members regarding their food and restaurant preferences, cookware shopping habits, consumption of media, geolocation, and many more. This confidential information is then added to consumer profiles and monetized for targeted advertising purposes, among other things.

314. By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class

Members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

315. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy, intrusion upon seclusion, CIPA, and other state wiretapping and data privacy laws, among others.

316. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. Here, as alleged above, "[t]he association of Plaintiff's data with preexisting user profiles is a further use of Plaintiff's data that satisfies [the crime-tort] exception," because it "violate[s] state law, including the [CIPA], intrusion upon seclusion, and invasion of privacy." *Brown v. Google, LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021); *see also Marden v.LMND Medical Group, Inc.*, 2024 WL 4448684, at *2 (N.D. Cal. July 3, 2024); *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 902 (C.D. Cal. 2024).

317. Defendant was not acting under the color of law to intercept Plaintiff and Class members' wire or electronic communications.

318. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy. Plaintiff and Class members had a reasonable expectation that Defendant would not intercept their communications and sell their data to dozens of parties without their knowledge or consent.

319. The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. §§ 2511(1), *et seq*.

320. As a result of each and every violation thereof, on behalf of themselves and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. §§ 2510, *et seq*.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all Class Members, seeks judgment against Defendant, as follows:

(a)     For an order certifying the Classes pursuant to Fed. R. Civ. P. 23, naming Plaintiff as the representative of the Classes, and naming Plaintiff's attorneys as Class Counsel to represent the Classes.

(b)     For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(c)     For compensatory, punitive, and statutory damages in amounts to be determined by the Court and/or jury;

(d)     For pre- and post-judgment interest on all amounts awarded; and

(e)     For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated:  March 6, 2026                    Respectfully submitted,

**BURSOR & FISHER, P.A**.

By: */s/ Philip L. Fraietta*

Philip L. Fraietta (State Bar No. 354768)
50 Main St., Ste. 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
E-mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Kaili C. Lynn (State Bar No. 334933)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: klynn@bursor.com
          jwilner@bursor.com

**BURSOR & FISHER, P.A.**
Max S. Roberts (State Bar No. 363482)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10069
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-mail: mroberts@bursor.com

*Attorneys for Plaintiff*